# Exhibit 2

**IN THE COURT OF COMMON PLEAS
LORAIN COUNTY, OHIO**

FILED
LORAIN COUNTY

2022 OCT 11  A 8: 21

COURT OF COMMON PLEAS
TOM ORLANDO

22 CV207 195

Case No.

Judge

|  |  |
|---|---|
| NORMAN HUSAR, on behalf of himself and those similarly situated<br>% DannLaw<br>15000 Madison Avenue<br>Lakewood, OH 44107<br><br>     Plaintiff(s)<br><br>     v.<br><br>**DOLGEN MIDWEST, LLC<br>d/b/a DOLLAR GENERAL,**<br>c/o Corporation Service Company<br>3366 Riverside Dr., Ste. 103<br>Upper Arlington, OH 43221<br><br>     Defendant. | **CLASS ACTION COMPLAINT FOR DAMAGES**<br><br>**JURY DEMAND ENDORSED HEREON** |

Plaintiff Norman Husar ("Plaintiff"), individually and on behalf of all others similarly situated, through his attorneys, brings this action against Defendant DolGen Midwest, LLC d/b/a Dollar General ("Defendant" or "DG"), and alleges upon personal knowledge as to his own actions and experiences, and upon investigation, information and belief as to all others, as follows:

## NATURE OF THE ACTION

1.    This is a consumer protection class action against DG arising out of DG's policies and procedures of regularly charging the Plaintiff and putative class members a higher price at the register than the price of merchandise advertised on the shelves at the time of sale at Dollar General stores across Ohio.

2.    This class action arises from DG's regular practice of charging customers a higher price on various items than the price advertised on its shelves in violation of the Ohio Consumer Sales Practices Act, ORC 1345.01, *et seq.*

## PARTIES, JURISDICTION, AND VENUE

3.     Plaintiff Norman Husar ("Plaintiff") is a natural person who resides in the City of Cincinnati, County of Hamilton, State of Ohio.

4.     Defendant Dolgen Midwest, LLC d/b/a Dollar General ("DG") is a foreign limited liability company organized under the laws of the State of Tennessee with its principal place of business located at 100 Mission Ridge, Goodlettsville, TN 37072.

5.     This Court has jurisdiction pursuant to R.C. 1345.04 as this action arises under the Ohio Consumer Sales Practices Act, R.C. 1345.01, *et seq.* ("CSPA").

6.     Venue lies in this Court as the substantial majority of the transactions giving rise to the Plaintiff's causes of action occurred within various DG stores throughout Lorain County, Ohio.

## FACT RELATED TO DOLLAR GENERAL

7.     Plaintiff and all others similarly situated are persons who shop at Dollar General stores in Ohio.

8.     DOLLAR GENERAL operates dollar stores that offer a variety of inexpensive merchandise, including home products, seasonal products, consumables, and apparel. The company's business model is about offering products at competitive prices (typically less than $10) in a convenient, small-store format. Its core customer category includes low-to-middle-income customers. The company's stores are located in convenient locations that are easily accessible to its customers. It follows a small-box format and the stores have an easy "in and out" shopping set-up.[1]

---

[1] See https://marketrealist.com/2017/04/dollar-general-why-small-format-stores-are-key/ (last visited September 26, 2022)

9.     Dollar General caters mainly to low-and-middle-income customers in rural and suburban areas. The company's core customers earn around $40,000 a year or below, $20,000 below the median income. Dollar General looks to build stores in rural areas where a big box retailer or grocery store is not within 15 or 20 miles. Around 75% of Dollar General stores are in towns with 20,000 or fewer people.[2]

10.     As of March 2022, DOLLAR GENERAL owned and operated approximately Nine Hundred Forty-Three (943) Dollar General stores in Ohio with more locations scheduled to open.[3]

## FACTS RELATED TO PLAINTIFF'S TRANSACTIONS

11.     The Plaintiff incorporates and restates the allegations contained in Paragraphs 1 through 10 as if fully set forth herein.

12.     The Plaintiff is a frequent customer of DG stores throughout Lorain County and Cuyahoga County.

13.     While shopping at various DG locations between early July 2022 and early September 2022, the Plaintiff noticed discrepancies between the prices of the merchandise advertised on the shelves and what he was charged at the checkout.

14.     When there was a price discrepancy, the Plaintiff was usually charged and paid more than the advertised price.

15.     As a result of these discrepancies, the Plaintiff began to track his purchases.

16.     In addition to tracking his purchases, the Plaintiff also began to document the advertised/shelf prices to compare them to what he was charged and paid at checkout.

---

[2] See https://www.cnn.com/2019/07/19/business/dollar-general-opposition (last visited September 26, 2022)

[3] *See* https://www.statista.com/statistics/1121086/number-of-dollar-general-stores-in-the-united-states-by-state/ (last visited September 26, 2022)

17.     Between July 2022 and early September 2022, the Plaintiff made purchases at various DG Store Locations located in Lorain County, Ohio and Cuyahoga County, Ohio including:

- DG Store #04686 located at 1651 Cooper Foster Park Rd, Amherst, OH 44001;

- DG Store #07807 located at 425 W 4th St, Lorain, OH 44052-1644;

- DG Store #12868 located at 2540 Leavitt Road, Lorain, OH 44052-4142;

- DG Store #15058 at 7628 S. Leavitt Road, Amherst, OH 44001;

- DG Store #15242 located at 5248 Colorado Avenue, Sheffield Village, OH 44054-2335;

- DG Store #17110 located at 3785 Clague Rd, North Olmsted, OH 44070-2302

- DG Store #20045 located at 12526 Bellaire Rd, Cleveland, OH 44135

18.     Between July 2022 and early September 2022, the Plaintiff made purchases at the stores noted where the following price discrepancies occurred:

19.     In July and August 2022, Plaintiff made several purchases at Dollar General stores in Lorain County and Cuyahoga County. The discrepancies are outlined below:

| Date of Purchase | Store Number | Brand | Product | Price of Shelf/Sign | Register Price | Discrepancy |
|---|---|---|---|---|---|---|
| 07/03/22 | 12868 | Pepsi | Mountain Dew 2L | $1.90 | $2.20 | $0.30 |
| 07/06/22 | 15252 | Coca-Cola | Coke Zero 16 oz | $1.00 | $1.25 | $0.25 |
| 07/10/22 | 07807 | DG Health | Anti-Diarrheal | $3.50 | $3.95 | $0.45 |
| 07/14/22 | 07807 | CRC Brakleen | Brake Parts Cleaner 14 oz | $4.45 | $5.50 | $1.05 |
| 07/18/22 | 15252 | Eveready | Gold Battery AAA-8 | $4.95 | $6.00 | $1.05 |
| 07/23/22 | 04686 | Energizer | Max Battery D-2 | $4.65 | $5.50 | $0.85 |
| 07/28/22 | 17110 | Coca-Cola | Cherry Coke 16 oz | $1.00 | $1.25 | $0.25 |
| 07/31/22 | 07807 | Wrigley's | Extra Gum Slim Pack | $1.00 | $1.35 | $0.35 |
| 08/01/22 | 15058 | Coca-Cola | Coke de Mexico | $1.25 | $2.00 | $0.75 |
| 08/01/22 | 15252 | Raid | Aerosol A&R 17.5 oz | $4.75 | $5.25 | $0.50 |

4

| 08/05/22 | 20045 | Raid | Ant Baits 4 ct | $4.00 | $4.50 | $0.50 |
| 08/05/22 | 20045 | Coca-Cola | Sprite 16 oz | $1.00 | $1.25 | $0.25 |
| 08/09/22 | 07807 | Santitas | Tortilla Chips | $2.29 | $2.45 | $0.16 |
| 08/27/22 | 07807 | Energizer | 9V Batteries | $4.65 | $4.95 | $0.30 |
| 09/01/22 | 07807 | Crystal Valley | Water | $0.85 | $0.95 | $0.10 |
| 09/01/22 | 07807 | Crystal Valley | Water | $1.50 | $1.65 | $0.15 |

*See also* Exhibit 1 to Complaint - Receipts and Proof of Purchase.

20.    Based on the allegations in Paragraph 19 above and Exhibit 1 between July 3, 2022 and September 1, 2022 the Plaintiff was overcharged at least $7.26.

21.    Based on the allegations here and as demonstrated by Exhibit 1 DG used the same procedures that it employed in charging higher prices than advertised to the Plaintiff when selling the same and/or similar merchandise to numerous other Ohio consumers.

22.    In the two (2) year period before the Complaint was filed DG charged prices that were higher than advertised that were the same or similar to the advertisements described, *supra*, to numerous Ohio consumers.

23.    Based on the allegations herein, *supra*, and demonstrated by Exhibit 1, It is DG's policy and practice to charge higher prices at the register for merchandise than the price advertised on the unit price labels for the same merchandise on the shelves in DG's Ohio stores.

## **CLASS ACTION ALLEGATIONS**

24.    **Class Definition:** Plaintiff brings this action pursuant to Civ. R. 23 on behalf of a class of similarly situated individuals and entities defined as follows:

> All persons who resided in Ohio on the date this complaint was filed, who at any time on or after the day two years prior to the date on which this Complaint was filed, who purchased merchandise at a Dollar General store located in Ohio.

25.    **Subclass Definition:** The Plaintiff also brings this action on behalf of a Subclass

of similarly situated individuals and entitled defined as follows:

> All members of the Class who paid more for merchandise than the advertised price labeled on the shelf at a Dollar General store located in Ohio.

26.     Excluded from the Class and Subclass are (1) the Defendant, Defendant's agents, subsidiaries, parents, successors, predecessors, and any entity in which the Defendant or its parent(s) have a controlling interest, and those entities' current and former employees, officers, and directors; (2) the Judge to whom this case is assigned and the Judge's immediate family; (3) any person who executes and files a timely request for exclusion from the Class and/or Subclass; (4) any person(s) who have had their claims in this matter finally adjudicated and/or otherwise released; and (5) the legal representatives, successors and assigns of any excluded parties.

27.     **Numerosity and Ascertainability:** Upon information and belief the Class and Subclass (the "Classes") are each composed of more than forty (40) members, such that the Classes are so numerous that joinder of all members is impractical.  This conclusion is reasonable given that Defendant operates 943 stores across Ohio as of March 2022 as noted above and the number of customers at each of DG's stores on a daily basis is likely dozens, if not hundreds or thousands of consumers.

28.     **Commonality and Predominance:** There are questions of law and fact common to the proposed Classes that predominate over any individual questions.  These questions of law and fact include, but are not limited to:

> a.  Whether the shelf price labels are advertisements under the GA Regulations.
>
> b.  Whether the shelf price labels are advertisements as defined by the CSPA;
>
> c.  Whether any or all of the purchases made by the Plaintiff and members of the Classes were consumer transactions as defined by the CSPA;
>
> d.  Whether the mis-priced shelf labels violate the CSPA;

    e.   Whether the Plaintiff and/or members of the putative Classes suffered an ascertainable loss as a result of the Defendant's unlawful practices;

    f.   Whether by charging consumers in Ohio more than the advertised shelf price at checkout, DG committed a deceptive act as defined by the CSPA;

29.    **Typicality:** Plaintiff's claims are typical of the claims of the Classes. Plaintiff and the putative Class Members were all subjected to and affected by a uniform course of conduct; specifically, DG's pattern and practice of charging Ohio consumers a higher price at the register than the posted price on the shelf for various pieces of merchandise.

30.    **Adequacy:** The Plaintiff will adequately represent the interests of the Classes. The Plaintiff does not have any interests adverse to the Classes. Plaintiff's proposed class counsel has a great deal of experience in handling class actions, other complex litigation, and claims of the type asserted in this action.

31.    **Superiority:** A class action is the superior method for the quick and efficient adjudication of this controversy since joinder of all members is impracticable. While the economic damages suffered by the individual members of the Classes are significant, the amount is modest compared to the expense and burden of individual litigation. The questions of law or fact common to the members of the Classes predominate over any question affecting only individual members. A class action will cause an orderly and expeditious administration of the claims of the Classes, and will foster economies of time, effort, and expense. Given the relatively small amount of damages available to Plaintiff and members of the Classes, adjudication on a classwide basis would provide members of the Classes with a remedy that they may be unlikely to pursue individually. Plaintiff does not anticipate any difficulty in the management of this litigation.

## CLASS CLAIMS

### COUNT ONE: VIOLATIONS OF THE CSPA, R.C. 1345.01, *et seq.*
### (On behalf of the Plaintiff and Classes)

32. Plaintiff restates and incorporates all of his allegations contained in paragraphs 1 through 31 in their entirety.

33. A "consumer transaction" is defined as "a sale, lease, assignment, award by chance, or other transfer of an item of goods, a service, a franchise, or an intangible, to an individual for purposes that are primarily personal, family, or household, or solicitation to supply any of these things." R.C. 1345.01(A).

34. DG's sales of merchandise to Plaintiff and the Class Members constitute "consumer transactions" because such services were for the primary purpose of Plaintiff's and the Class Members' personal, family, or household use. R.C. 1345.01(A).

35. Plaintiff and the Class Members are each a "consumer" because they engaged in a consumer transaction with DG. R.C. 1345.01(D).

36. DG is a "supplier" because it is engaged in the business of effecting or soliciting consumer transactions. R.C. 1345.01(C)

37. "No supplier shall commit an unfair or deceptive act or practice in connection with a consumer transaction. Such an unfair or deceptive act or practice by a supplier violates this section whether it occurs before, during, or after the transaction." R.C. 1345.02(A).

38. "No supplier shall commit an unconscionable act or practice in connection with a consumer transaction. Such an unconscionable act or practice by a supplier violates this section whether it occurs before, during, or after the transaction." R.C. 1345.03(A).

39. DG has engaged in unfair, deceptive, and/or unconscionable acts or practices in direct violation of the CSPA by charging a higher price at the register for merchandise than the

price as advertised on the shelf price labels for the same merchandise.

40.     Plaintiff and those similarly situated paid more for the merchandise they purchased than the price advertised on the shelf labels for that merchandise at the times of their purchases.

41.     Ohio Courts have determined that the actions of a supplier in failing to honor promised prices constitute unfair or deceptive acts or practices. *See State of Ohio ex rel. Petro v. Level Propane Gases, Inc.*, PIF No. 2198 (November 27, 2003) and *White v. Kent*, PIF No. 636 (March 30, 1988). A copy of PIF Nos. 2198 and 636 is attached as Exhibit 2.

42.     The Ohio Attorney General has made these determinations available for public inspection pursuant to R.C. 1345.05(A)(3).

43.     Plaintiff and the Class Members have a private right of action under the CSPA for the claimed breaches.

44.     As a direct and proximate result of the actions of DG which violate the CSPA, Plaintiff and the Class Members are entitled to actual damages in an amount to be determined at trial, as well as an award of reasonable attorneys' fees.

## COUNT TWO: UNJUST ENRICHMENT
### (On behalf of the Plaintiff and Classes)

45.     Plaintiff restates and incorporates all of his allegations contained in paragraphs 1 through 44 in their entirety.

46.     "The purpose of an unjust enrichment claim is not to compensate the plaintiff for loss or damage suffered by the plaintiff, but to enable the plaintiff to recover the benefit he has conferred on the defendant under circumstances in which it would be unjust to allow the defendant to retain it." *Barrow v. Vill. of New Miami*, 104 N.E.3d 814, 818 (Ohio Ct. App.

9

2018); *San Allen, Inc. v. Buehrer*, 11 N.E.3d 739, 781 (Ohio Ct. App. 2014).   Equitable "restitution is the remedy for the unjust enrichment of one party at the expense of another." *Id.*

47.     "To prevail on a claim for unjust enrichment, a plaintiff must demonstrate that: (1) he conferred a benefit upon the defendant, (2) the defendant had knowledge of the benefit, and (3) the defendant retained the benefit under circumstances where it would be unjust to do so without payment." *Id.*

48.     Based on the allegations herein, *supra*, DG has engaged in a pattern and practice of overcharging the Plaintiff and members of the Classes by at least $7.35 and collected monies from the Plaintiff and members of the Classes which DG knew or should have known that DG had no contractual or legal right to collect.

49.     Based on the allegations herein, DG enjoyed the use of these overcharges without providing any material benefit to the Plaintiff and members of the Classes.

50.     DG is therefore liable to the Plaintiffs and members of the Classes for an award of actual damages, compensatory damages, and punitive damages in amounts to be determined at trial.

## COUNT THREE: VIOLATIONS OF THE CSPA, R.C. 1345.01, *et seq.*
### (On behalf of Plaintiff individually)

51.     Plaintiff restates and incorporates all of his allegations contained in paragraphs 1 through 50 in their entirety.

52.     A "consumer transaction" is defined as "a sale, lease, assignment, award by chance, or other transfer of an item of goods, a service, a franchise, or an intangible, to an individual for purposes that are primarily personal, family, or household, or solicitation to supply any of these things." R.C. 1345.01(A).

53.     DG's sales of merchandise to Plaintiff constitute "consumer transactions" because

such services were for the primary purpose of Plaintiff's personal, family, or household use. R.C. 1345.01(A).

54.    Plaintiff is a "consumer" because he engaged in a consumer transaction with DG. R.C. 1345.01(D).

55.    DG is a "supplier" because it is engaged in the business of effecting or soliciting consumer transactions. R.C. 1345.01(C)

56.    "No supplier shall commit an unfair or deceptive act or practice in connection with a consumer transaction. Such an unfair or deceptive act or practice by a supplier violates this section whether it occurs before, during, or after the transaction." R.C. 1345.02(A).

57.    "No supplier shall commit an unconscionable act or practice in connection with a consumer transaction. Such an unconscionable act or practice by a supplier violates this section whether it occurs before, during, or after the transaction." R.C. 1345.03(A).

58.    DG has engaged in unfair, deceptive, and/or unconscionable acts or practices in direct violation of the CSPA by charging a higher price at the register for merchandise than the price as advertised on the shelf price labels for the same merchandise.

59.    Plaintiff paid more for the merchandise he purchased than the price advertised on the shelf labels for that merchandise at the times of his purchases.

60.    Ohio Courts have determined that the actions of a supplier in failing to honor promised prices constitute unfair or deceptive acts or practices. *See State of Ohio ex rel. Petro v. Level Propane Gases, Inc.*, PIF No. 2198 (November 27, 2003) and *White v. Kent*, PIF No. 636 (March 30, 1988). *See* Exhibit 2.

61.    The Ohio Attorney General has made these determinations available for public inspection pursuant to R.C. 1345.05(A)(3).

62.     Plaintiff has a private right of action under the CSPA for the claimed breaches and such action provides for remedies including actual damages, costs, treble damages, statutory damages and attorneys' fees.

63.     As a direct and proximate result of the actions of DG which violate the CSPA, Plaintiff is is entitled to actual damages in an amount to be determined at trial or statutory damages of $200.00, non-economic damages of up to $5,000.00, treble damages, as well as an award of reasonable attorneys' fees.

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff Norman Husar, on behalf of himself and those similarly situated, respectfully requests that that this Court grants judgment against Defendant Dolgen Midwest, LLC d/b/a Dollar General, and issue an Order:

A. Finding that this action satisfies the prerequisites for Finding that this action satisfies the prerequisites for maintenance as a class action and certifying the Class and Subclass, each as defined, *supra*;

B. Designating the Plaintiff as a representative of the Class and Subclass, and his undersigned counsel as Class Counsel;

C. Awarding the Plaintiff, Class and Subclass their actual damages;

D. Awarding the Plaintiff, Class and Subclass their statutory damages, as applicable;

E. Awarding the Plaintiff his statutory non-economic damages for the violations of the CSPA, as applicable;

F. Awarding the Plaintiff, Class, and Subclass, treble damages, as applicable, for the violations of the CSPA;

G. Awarding the Plaintiff, Class and Subclass punitive damages, as applicable;

I.   Granting all such further and other relief as this Court deems just and appropriate.

Respectfully submitted,

*Whitney Kaster*

Whitney Kaster (0091540)
Marc E. Dann (0039425)
Brian D. Flick (0081605)
Michael A. Smith Jr. (0097147)
**DANN LAW**
15000 Madison Avenue
Lakewood, OH 44107
Telephone: (216) 373-0539
Facsimile: (216) 373-0536
notices@dannlaw.com

*Counsel for Plaintiff and the Putative Classes*

## JURY DEMAND

Plaintiff Norman Husar hereby respectfully demands a trial by jury on all such claims that

may be so tried.

*Whitney Kaster*

Whitney Kaster (0091540)
Marc E. Dann (0039425)
Brian D. Flick (0081605)
Michael A. Smith Jr. (0097147)
**DANN LAW**
*Counsel for Plaintiff and the Putative Classes*

13

# EXHIBIT 1

DOLLAR GENERAL







DOLLAR GENERAL

POS STICKER DISPLAYED $1.50 - DID NOT TAKE PICTURE BEFORE PURCHASE

NO POS STICKER NOW - PIC BELOW TAKEN ABOUT 20 MINS AFTER PURCHASE









DOLLAR GENERAL

POS PIC TAKEN 9.1.22 - SAME POS AS 8.27.22









DOLLAR GENERAL 08.09.22







DOLLAR GENERAL



Loperamide Hydrochloride Tablets, 2 mg

# Anti-Diarrheal

- Controls the symptoms of diarrhea
- Anti-Diarrheal



DG Health
A0356 Anti
Diarrheal-Cplt
24ct

$3 50

14.6¢



DOLLAR GENERAL-12526 BELLAIRE RD, CLEV, OH 44135



















PICS ABOVE TAKEN 8.5.22 - NO RAID PRODUCTS AVAILABLE



DOLLAR GENERAL







DOLLAR GENERAL









DOLLAR GENERAL







DOLLAR GENERAL





DOLLAR GENERAL



DOLLAR GENERAL - D BATTERY - POS STICKER DIFFERENCES



ABOVE - DG NORTH OLMSTED 07.29.22



ABOVE DG AMHERST, OH 07.23.22

DOLLAR GENERAL







# DOLLAR GENERAL



Eveready Gold
Battery AAA-8
Alkaline
6+ End 30 (2L)

$4.95
per each

$**4**95

033-0003-000
0'21  E

A-P
F2

$^\$4^{95}$

DOLLAR GENERAL









DOLLAR GENERAL





DOLLAR GENERAL



# EXHIBIT 2

PIF Number: 10000636

Case Name: WHITE V. KENT; JOSEPH CHEVROLET

Case Number: C860520

IN THE COURT OF APPEALS

FIRST APPELLATE DISTRICT OF OHIO

HAMILTON COUNTY, OHIO

RECEIVED

⋯ 0 ⋯ 1988

ATTORNEY GENERAL OF OHIO
CONSUMER FRAUDS & CRIMES
PUBLIC INSPECTION FILE

RECEIVED

⋯ 1 ⋯

ATTORNEY GENERAL ⋯ O
CONSU⋯ ⋯ ⋯ ⋯ ⋯ES
PUBLIC INSPECTION ⋯ ⋯

DEBBIE WHITE,

    Plaintiff-Appellee,    :

  vs.               .

JEFFREY KENT        :
    and
JOSEPH CHEVROLET,    :

    Defendants-Appellants.:

APPEAL NO. C-860520
TRIAL NO. 85CV-06570

D E C I S I O N.

FILED
COURT OF APPEALS

MAR 3 0 1988

CLERK OF COURTS

Civil Appeal from:  Hamilton County Municipal Court

Judgment Appealed from is:  Affirmed in Part: Judgment Entered
                          and Cause Remanded

Date of Judgment Entry on Appeal:  March 30, 1988

David J. Boyd, Esq., 500 Executive Building, 35 East Seventh
Street, Cincinnati, Ohio  45282, for Plaintiff-Appellee,

Lindhorst & Dreidame and Jay R. Langenbahn, Esq., 1700 Central
Trust Center, 201 East Fifth Street, Cincinnati, Ohio  45202, for
Defendants-Appellants.

**PER CURIAM.**

This **cause** came on to be heard upon the appeal, the tran-
script of the docket, journal entries and original papers; from
the Hamilton County Municipal Court, the transcript of the pro-
ceedings, the briefs and the argument of counsel.

Plaintiff-appellee Debbie White (White) was considering the
purchase of a new **car** in November 1984, White, accompanied by
her sister and her mother, met with a salesman of Joseph Chevro-
let, Jeffrey Kent (collectively, appellants), White explained
that she was interested in a Chevrolet Cavalier station wagon
with certain optional equipment.

No vehicle meeting White's specification was available at
appellants' place of business, but Kent suggested that he might
be able to find a suitable car using a computerized **automobile**
"locator" and to have the car brought to his lot. After some nego-
tiations, a "deal" was arranged whereby White agreed to pay **about**
$235.00 per month for the car:, An exact price could not be
determined because the particular car which White selected had
not yet been delivered to appellants. Eventually, White
purchased the car.

After she examined the paperwork on the car, it became obvious
to White that $2000.00 had been added to the sticker price of the
automobile, Appellants' explanation for this additional amount
was that White's trade-in was also increased by $2000.00 in order
to give White some "equity" in the new car to make financing

- 2 -

easier. As the $2000.00 increase over the sticker price was completely offset by the $2000.00 increase on the value of the trade-in, appellants contended that the price of the new car to White was unchanged from what she had agreed upon.

White was not satisfied with this explanation because she understood the transaction differently. White believed that she was initially going to receive additional value for her old car rather than a reduction in the sticker price of the new car:. Therefore, according to White, the additional $2000.00 increase in the value of the trade-in should ultimately have been deducted from the original sticker price of the new car,

Subsequently, White filed suit in the Hamilton County Municipal Court under the Ohio Consumer Sales Practices Act, R.C. Chapter 1345. After a trial by jury, a verdict was returned in favor of White, Actual damages were found to be $3100.00, and they were trebled pursuant to the statute to $9,300.00. Further, attorney fees were awarded in the amount $1500.00 for a total judgment in the amount of $10,800.00.

Appellants have assigned three errors to the trial court in this timely appeal. The first and second assignments of error are interdependent and will be considered together:

First assignment of error

The trial court erred to the prejudice of the appellant [sic] by submitting the issue of treble damages to the jury.

Second assignment of error

> The jury **verdict** is prejudicial to the appellant [sic] in that it is against the manifest weight of the evidence.

It is clear from the complaint that an unfair consumer practice was being alleged against appellants, **and** therefore, if the judgment is not against the manifest weight of the evidence, then the trial court properly submitted the question of treble damages to the jury. Accordingly, the result of the second assignment of error may well be determinative on the first assignment of error.

In the trial of a civil suit it has been long established that "[j]udgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed by a reviewing court as being against the manifest weight of the evidence," *C. E. Morris Co. v. Foley Construction Co.* (1978), **54** Ohio St. 2d 279, 376 N.E.2d 578, syllabus. **We** hold that the evidence fully supports the jury's finding of an unfair consumer practice,

At trial, White, her sister and her mother all testified that the $2000.00 increase in the value of White's trade-in was in lieu of a reduction in the sticker price of the new car. While White argues that **numerous** unfair and unconscionable consumer practices were committed, **we** think it is sufficient to note that the statute specifically states that it is **an** unfair consumer practice for a supplier to indicate that a "specific price advantage exists, if it does not." R.C. 1345.02(B)(8). If the jury believed white and her witnesses, then it could have

- 4 -

found that both Kent, the salesman, and Gary Cunningham, the finance manager, told White that a price advantage existed where it did not, The testimony was competent and not incredible.

Appellants argued strongly, both at trial. and In oral argument before us, that the deal a5 described by White would not have made economic sense because the dealership would have sold the new car for less than what it coot them, and that White would have received more than she paid for her trade-in after driving it for about two years and putting about 14,000 additional miles on the odometer.

certainly the jury did not have to find that the dealership was planning on losing money, All that was necessary was that the jury believed that White was told of a price which was not the true price, The jury could have thought that appellants never had any intention of actually selling the car for the amount they told White, but rather that they intended to increase the purchase price from the beginning of the negotiations. The jury was completely free to believe all, part or none of what any witness said. *State v. Antill* (1964), 176 Ohio St. 61, 197 N.E.2d 548. Accordingly, the jury's verdict was not inconsistent with the manifest weight of the evidence, and the trial court did not err in submitting the issue of treble damages to the jury. The first and second assignments of error are overruled.

In the third assignment of error, appellants claim that the trial court erred in overruling their motion for judgment

- 5 -

notwithstanding the verdict or **for** a new trial.  In both the memorandum in support of the motion **to** the trial court and their appellate brief *to* this court, appellants incorporate their arguments from the first and second assignments of error.  For the reasons expressed in the foregoing, we overrule the third assignment of error,

Finally, we note that the amount awarded, **$10,800.00**, exceeded the **$10,000.00** jurisdictional limit of the municipal court, R.C. 1901.17.  Therefore, **we vacate** said judgment and we enter the judgment that the trial court should **have** entered, $10,000.00, pursuant to App. R. 12(B).  We remand the **cause** to the trial court for a determination of **how the** reduction should be divided between the trebled damages **and** the **award** of attorney fees.  In all other respects the judgment is affirmed.

**BLACK, P.J., DOAN and KLUSMEIER, JJ.**

**PLEASE NOTE:**

The Court **has** placed of record its own **entry** in this **case** on the date of the **release** of this Decision.

RECEIVED
ATTORNEY GENERAL OF OHIO

**IN THE COURT OF COMMON PLEAS**
**DELAWARE COUNTY, OHIO**

NOV 2 7 2003

CONSUMER PROTECTION SECTION
PUBLIC INSPECTION FILE

STATE OF OHIO, *ex rel.*     )
JIM PETRO                    )
ATTORNEY GENERAL OF OHIO     )     CASE NO. 01-CVH 01-018
                             )
    Plaintiff,              )
                             )     JUDGE W. DUNCAN WHITNEY
    v.                      )
                             )
LEVEL PROPANE GASES, INC.    )     <u>AGREED ENTRY & ORDER</u>
                             )
    Defendant.              )

This matter came to be heard upon the filing of a Complaint by the Attorney General of

Ohio on January 8, 2001. Subsequent to the filing of the Complaint, Defendant Level Propane

Gases, Inc. (Level) filed a Chapter 11 Bankruptcy proceeding in the United States Bankruptcy

Court, N.D. Ohio (Case No. 02-16172). A prior agreement between the parties was rejected

pursuant to 11 U.S.C. Section 365. By signing this Agreed Entry, Level submits to the personal

jurisdiction of this court and consents to the entry of this Agreed Entry and Order ("Agreed

Order").

This Agreed Order shall apply to and bind Level, its shareholder(s), officers, directors,

agents, servants, employees, subsidiaries, successors or assigns, and any person or entity acting

through any corporation or other propane businesses whose acts, practices, or policies are, in any

respect, directed, formulated, or controlled by Level.

TERMINATION CODE _____5_____

## DEFINITIONS

As used in this Agreed Order, the following terms shall have the following meanings:

1.  "Advertisement" means any oral, written, graphic, electronic or pictorial statement or representation directed to consumers in the course of business, regardless of the medium of communication employed.

2.  "Business Day(s)" means Monday through Friday of any given week.

3.  "Calendar Day(s)" means Sunday through Saturday of any given week.

4.  "Clear and conspicuous" means that the statement, representation or term being disclosed is of such size, color, contrast and audibility and is so presented as to be readily noticed and understood by the person to whom it is being disclosed. The disclosure of any written statement or term must be in close proximity to the terms it purports to clarify, modify, or explain.

5.  "C.O.D." means cash on delivery.

6.  "Consumer" means a person as defined in R.C. §1345.01(D).

7.  "Contract" means the written agreement entered into between Level and the consumer prior to the filing of this Agreed Order.

8.  "Contract Price" means any of the following:

    A.  a clear, conspicuous, and unambiguous written price representation by Level to a consumer or consumers;

    B.  an oral price quote by any employee or agent of Level including, but not limited to, drivers and customer service representatives that is confirmed by Level;

    C.  a web site quote.

2

9.     "Courtesy Fill" means Level will deliver propane to consumers according to Level's estimate of the consumers' propane use.

10.    "Lock-in Agreement" means Level's offer to consumers whereby consumers may guarantee a price of propane for a stated price per gallon for a stated period of time.

11.    "Market Price" means the actual price at which propane gas is currently sold, or has recently been sold, in the open market at retail in the usual and ordinary course of trade and competition between sellers and buyers equally free to bargain, as established by records of sales or the last reported price at which the propane sold.

12.    "Material Terms and Conditions" means the price per gallon of propane, delivery date, and fees/charges that the consumer may be required to pay, any conditions affecting the price or delivery date, and any other terms or conditions which may affect the consumer's choice of a propane supplier.

13.    "Minimum Usage" means the minimum number of gallons of propane that a consumer must purchase during the term of the contract in order to avoid the payment of any Underutilization Fee or any other fee or penalty.

14.    "Pre-Buy Agreement" means Level's offer to consumers whereby consumers may pre-pay for a specific amount of propane for a stated price per gallon for a stated period of time by paying for such propane in advance of delivery.

15.    "Represent," "Representing," and "Representation" mean and include any communication, including any advertisement whether made in writing, orally, by picture, design, or other graphics, and made by any means or mode of transmission including, but not limited to, telephonic or electronic transmission.

3

"Represent," "Representing" and "Representation" include any implied representation.

16. "Underutilization Fee" means the amount a consumer must pay if the consumer does not purchase the minimum number of gallons of propane required under the terms of the contract. It is also the total amount charged to the consumer as calculated by the minimum gallons of propane gas that must be purchased multiplied by the quoted price per gallon, less the actual gallons purchased multiplied by the actual price charged.

17. "Will Call" means Level will deliver propane to consumers after the consumers request delivery of propane.

## AGREED FINDINGS OF FACT

1. Defendant is a corporation incorporated in the State of Ohio.

2. Defendant was engaged in the business of soliciting for sale and selling liquid petroleum gas, commonly known as propane, and related products and services in Delaware County and numerous other counties throughout Ohio.

3. Defendant regularly advertised its propane product throughout the State of Ohio.

4. Level required its customers to enter into written agreements for the purchase of propane.

## AGREED CONCLUSIONS OF LAW

1. This Court has jurisdiction over the subject matter, issues, and parties to this judgment.

2. The Ohio Attorney General is the proper party to bring this action and venue is proper.

4

3.   The Consumer Sales Practices Act, R.C. §1345.01 et seq. governs the business practices of the Defendant.

4.   At all relevant times hereto, Level was a "supplier" as that term is defined in R.C. §1345.01 (C) in that it engaged in the solicitation of "consumer transactions" as that term is defined in R.C. §1345.01(A).

## CONCLUSIONS OF LAW ASSERTED BY THE ATTORNEY GENERAL AND ADOPTED BY THE COURT

1.   A propane supplier's practice of making offers in written or printed advertisements without stating clearly and conspicuously in close proximity to the words stating the offer any material exclusions, reservations, limitations, modifications, or conditions to obtaining the offered propane and/ or the offered price is an unfair and deceptive act or practice in violation of the Exclusions and Limitations in Advertisements Rule, O.A.C. §109:4-3-02(A)(1) and the Consumer Sales Practices Act, R.C. §1345.02(A).

2.   A propane supplier's practice of failing to honor guaranteed or promised prices is an unfair, deceptive and unconscionable act or practice in violation of the Consumer Sales Practices Act, R.C. §1345.02(A), R.C. §1345.02(B)(8) and R.C. §1345.03(A).

3.   A propane supplier's practice of refusing to disclose the price of the propane that it is delivering to consumers is an unfair, deceptive, and unconscionable act or practice in violation of the Consumer Sales Practices Act, R.C. §1345.02(A), R.C. §1345.03(A), R.C. §1345.03(B)(5), and the Repairs or Services Rule, O.A.C. §109:4-3-05.

4.    A propane supplier's practice of advertising that its propane prices are "low" or the "lowest" available when its prices are sometimes substantially higher than its competitors, or promising high quality service, when such is not the case is an unfair and deceptive act or practice in violation of the Consumer Sales Practices Act, R.C. §1345.02(A) and R.C. §1345.02(B)(8).

5.    A propane supplier's practice of advertising or promising prompt delivery of propane to consumers without having taken, at the time of the advertisement or promise, commercially reasonable action to insure prompt delivery of propane to consumers is an unfair and deceptive and unconscionable act or practice in violation of the Consumer Sales Practices Act, R.C. §1345.02(A), R.C. §1345.03(A), and the Failure to Deliver Rule O.A.C. §109:4-3-09.

6.    A propane supplier's practice of failing to respond to valid consumer complaints and/or to provide adequate customer service within a reasonable period of time is an unfair and deceptive act or practice in violation of the Consumer Sales Practices Act, R.C. §1345.02(A) and R.C. §1345.03(A).   A propane supplier commits an unfair and deceptive act in violation of R.C. §1345.02 by failing to provide consumers who have purchased a propane tank from it with proof of purchase and ownership of the tank.

7.    A propane supplier commits an unfair and deceptive act in violation of R.C. §1345.02 by failing to incorporate all material terms in its contracts with consumers, including clear and conspicuous disclosure of terms relating to price and any pricing program (i.e. Pre-pay, lock-in), any delivery program (i.e. Courtesy Fill, Will Call), minimum usage, tank delivery and pick-up, disconnection, reconnection, pump-outs, and the terms and conditions under

6

which the propane supplier can change the delivery or payment status of the consumer (i.e., from Courtesy Fill to Will Call, C.O.D. or Payment in Advance).

8. A propane supplier commits an unfair and deceptive act in violation of R.C. §1345.02 by failing to honor its Lock-In Agreement prices as specified in the contract with the consumer.

9. A propane supplier commits an unfair, deceptive and unconscionable act in violation of R.C. §§1345.02 and 1345.03 by incorporating in its consumer contract, or attempting to enforce, any provision that permits the propane supplier to unilaterally modify the contract with the consumer or any provision that limits the consumer to a specific court of competent jurisdiction when commencing a civil action against the supplier.

10. A propane supplier commits an unfair and deceptive act in violation of R.C. §1345.02 by misrepresenting any material terms or conditions in connection with the advertisement, offer, sale, or delivery of propane to consumers.

11. A propane supplier commits an unfair and deceptive act in violation of R.C. §1345.02 if it fails to use commercially reasonable efforts and standards to determine and provide an appropriately sized propane tank designed to meet the consumer's propane needs.

12. A propane supplier commits an unfair, deceptive and unconscionable act in violation of R.C. §§1345.02 and 1345.03 by charging a consumer more for an emergency delivery of propane than for a regular delivery of propane when the emergency need was the result of the propane supplier's failure to provide a timely deliver of propane.

13.     Until the earlier of (i) a propane supplier obtaining a written agreement with the consumer for the delivery of propane and/or the setting up of a tank, or (ii) a propane supplier receiving payment for the delivery of propane to a consumer, such supplier will be required to remove the tank and any other related equipment at no expense to the consumer if so requested by the consumer in writing.

14.     A propane supplier commits an unfair and deceptive act in violation of R.C. §1345.02 if it fails to disclose during an oral price quote the price per gallon of propane, the time period for which the quoted price will be available, the time period for which the quoted price applies, and all other material terms and conditions applicable to receiving propane at the quoted price.

## NON-ADMISSION BY LEVEL

Level does not admit that it has engaged in any wrongdoing and the court makes no finding that Level has operated in violation of the Consumer Sales Practices Act §1345.01 et seq. Level enters into this Agreed Order with the Attorney General to resolve the matters before this Court.

## ORDER

For the purpose of effecting this Agreed Order, Level agrees and it is therefore ORDERED, ADJUDGED, and DECREED that:

A.      Level is permanently enjoined from engaging in any act or practice in violation of the Consumer Sales Practices Act, R.C. §§1345.01 et seq., any act or practice prohibited by the Conclusions Of Law Asserted By The Attorney General And Adopted By The Court, and the following described acts:

1.      Charging the consumer for any propane gas not delivered to the consumer; unless the consumer's agreement with Level specifically sets forth the terms and

8

conditions for imposing such a charge and all such terms and conditions have been met;

2. On a consumer's request therefor, failing to provide all Level consumers who have purchased tanks from Level with proof of ownership necessary for these consumers to exercise their right to have their own tanks filled by Level's competitors;

3. Falsely representing that Level's prices will remain "level," or words of similar import, or that Level purchases fuel prior to any heating season so as to ensure the customer will not be harmed by rise in fuel prices;

4. Failing to honor its Lock-in Agreement prices for the term specified in Level's existing Contract with a consumer provided that the consumer is not in material breach of the Contract, said material breach including but not limited to non-compliance with payment terms;

5. Employing or continuing to employ any unfair or deceptive practices against any consumer who, in good faith, refuses to pay Level for any increased cost of propane or any other fee not specifically authorized by its existing Contract;

6. Utilizing or enforcing any provision purporting to reserve to Level the unfettered right to modify the Contract unilaterally; or, (ii) any provision limiting the consumer to commencing an action against Level only in a specific court of competent jurisdiction;

7. Subject to the requirements of paragraph 7 of Section B of this Agreed Entry and Order, and except for purposes of asserting its rights to the following fees for purposes of setoff against a consumer claim, collecting or attempting to collect

9

any fees, charges, penalties or monies Level claims is owed by any Level consumers prior to June 6, 2002 for the following:

a.     underutilization fees;

b.     tank pick up fees and taxes;

c.     tank pump-out fees;

d.     the difference between the price of propane set forth in the consumer's Lock-in Agreement and the cost actually charged. If consumers have not yet paid the increased amount to Level, Level will adjust the consumers' bills to reflect the price of propane set forth in the consumer's pre-buy or lock-in Contract;

e.     for those consumers who were promised a certain price per gallon in writing including, but not limited to, any correspondence or delivery receipts, the difference between the price actually charged and the price of propane represented in the writing;

f.     for those consumers who received delivery of propane after the end of the term of the Contract at an increased price per gallon above the price set forth in their Contracts and who canceled their Contract at the end of the term due to the increase in the price per gallon of propane but were billed at the increased amount, the difference between the amount charged and the amount set forth in their Contracts for any propane used by the consumer.

g.     any lock-in fee if the consumer did not receive the price promised by Level at any time the locked-in price promise was to remain effective;

10

h.   any fees, deposits, or other payments not disclosed in Level's Contract with the consumer or not lawfully charged including, but not limited to, surcharges for consumer's use of credit (or credit card), adjusting the customer's account to zero balance when the customer had a credit balance in the account, miscellaneous fees, deviation fees, and retrieval fees;

i.   any late payment penalty, without qualification, that has been assessed based upon an underutilization charge, a tank pump-out fee, a disconnection fee, reconnection fee, tank pick-up fee, or the difference between the cost quoted for propane and the cost actually charged; and

j.   any late payment fee or returned check fee where such fees were not permitted by law.

B.   Level agrees to comply with the following business practices;

1.   Level shall take commercially reasonable steps to direct all credit reporting agencies to remove any negative or derogatory information regarding Level, which is incorrect, within thirty (30) days of receiving a complaint by a consumer which is supported by evidence that the reporting is incorrect.

2.   Level shall not charge more than the amount allowable under applicable state or federal law for a late payment and shall not collect or attempt to collect any such late charge not specifically disclosed in Level's Contract with the consumer.

3.   Level shall not use any debt collection practices, which are in violation of Ohio or federal laws.

4.   Level shall maintain records, correspondence, receipts and any other documentation relating to all accounts for consumers of Level for a period of

11

three (3) years while they are customers of Level and for a period of two (2) years after termination of any relationship between Level and the consumer.

5. Level shall comply with Ohio's referral sales statutes.

6. Level shall give written notice of any bankruptcy filing to the Attorney General within five (5) business days of such filing.

7. In the event Level or majority voting control of its stock is sold, transferred or conveyed, or Level is merged with and into another entity, the documents that evidence such a transaction shall include a provision that, except for purposes of asserting its rights to the following fees for purposes of setoff against a consumer claim, prohibits Level's successor from collecting or attempting to collect any fees, charges, penalties or monies Level claims is owed by any Level consumers prior to June 6, 2002 for the following:

   a. underutilization fees;

   b. tank pick up fees and taxes;

   c. tank pump-out fees;

   d. the difference between the price of propane set forth in the consumer's Lock-in Agreement and the cost actually charged. If consumers have not yet paid the increased amount to Level, Level will adjust the consumers' bills to reflect the price of propane set forth in the consumer's pre-buy or lock-in Contract;

   e. for those consumers who were promised a certain price per gallon in writing including, but not limited to, any correspondence or delivery receipts, the difference between the price actually charged and the price of propane represented in the writing;

12

f.   for those consumers who received delivery of propane after the end of the term of the Contract at an increased price per gallon above the price set forth in their Contracts and who canceled their Contract at the end of the term due to the increase in the price per gallon of propane but were billed at the increased amount, the difference between the amount charged and the amount set forth in their Contracts for any propane used by the consumer.

g.   any lock-in fee if the consumer did not receive the price promised by Level at any time the locked-in price promise was to remain effective;

h.   any fees, deposits, or other payments not disclosed in Level's Contract with the consumer or not lawfully charged including, but not limited to, surcharges for consumer's use of credit (or credit card), adjusting the customer's account to zero balance when the customer had a credit balance in the account, miscellaneous fees, deviation fees, and retrieval fees;

i.   any late payment penalty, without qualification, that has been assessed based upon an underutilization charge, a tank pump-out fee, a disconnection fee, reconnection fee, tank pick-up fee, or the difference between the cost quoted for propane and the cost actually charged; and

j.   any late payment fee or returned check fee where such fees were not permitted by law.

Provided, however, such successor in interest may assert its right to such fees if a consumer first brings a legal action against such successor and such successor asserts such rights solely for purposes of setoff against the consumer claim; provided, however, such rights to setoff

13

only may be exercised in compliance with R.C. §1345. Except as expressly provided in this section 7, the Attorney General hereby withdraws its objection to the transfer of some or all of Level's (and its affiliate's) assets free and clear of any interest the Attorney General may have in such assets or with regard to Level or its affiliates.

8.    Upon reasonable request, Level shall provide copies of or access to the requested books, records and documents to the Attorney General at any time upon reasonable notice, and further make available other information to the Attorney General relating to compliance of this Agreed Entry & Order. Level shall make the requested information available at Level's offices or, at Level's election, shall deliver copies of the requested information to the Attorney General, in each case, within fourteen (14) business days of such request. This Section shall in no way limit the Attorney General's right to obtain documents, information, or testimony pursuant to any federal or Ohio law, regulation or rule.

9.    Level shall immediately inform its employees and representatives acting in a supervisory capacity of the existence of, and terms and conditions of, this Agreed Entry And Order and shall direct those persons and/or entities to comply with this Agreed Entry and Order.

10.    Level shall implement and maintain business practices designed in a commercially reasonable manner to minimize customer service related concerns including, but not limited to: failure to provide deliveries, repeated missed delivery dates, inability by consumers to reach Level's customer service representatives, billing questions immediately turned over to Level's collection department regardless of the circumstances, and other billing disputes.

11.     Level shall not renew any consumer's existing Contract unless that Contract conforms to the terms of this Agreed Entry And Order and all applicable laws.

12.     Level shall not enter into any Contract with a consumer to provide that consumer with propane unless the Contract conforms to the terms of this Agreed Entry And Order and all applicable laws.

13.     On filing and entry of this Agreed Order, notwithstanding the "Governing Law" paragraph in Level's Contracts, Level hereby agrees not to object to consumer disputes being litigated in the jurisdiction in which the consumer resides. Level further agrees that its consumer contracts are subject to the consumer protection laws of the states in which the consumer resides.

C.     The parties acknowledge that the Attorney General, in his complaint, sought reimbursement for consumers damaged by the alleged illegal conduct of Level. The parties originally contemplated that this case would be settled in conjunction and coordination with the settlement of a class action known as Larry Mick, et al. v. Level Propane Gases, Inc., United States District Court for the Southern District of Ohio, Eastern Division, Case No. C-2-98-959, a class action covering all Ohio consumers potentially eligible for damages through the Attorney General's instant action with the consumer class represented by private counsel. These consumer claims are now subject to, and being addressed in, the pending Level bankruptcy action known as In Re Level Propane Gases, Inc., et al., Debtors, Chapter 11 Case No. 02-16172 (Jointly Administered), United States Bankruptcy Court, Northern District of Ohio, Judge Randolph Baxter presiding.

D.     It is hereby ORDERED that Level shall not represent, directly, or indirectly, that the Attorney General has sanctioned, condoned, or approved any part or aspect of the Defendant's business operation.

15

E.      It is hereby ORDERED that Level is assessed a civil penalty pursuant to R.C.
§1345.07(D) in the amount of Two Hundred Fifty Thousand Dollars ($250,000.00).    Two
Hundred Thousand Dollars is suspended on the condition that Level not violate the terms of this
Agreed Entry & Order.   The parties hereto agree that such civil penalty is a pre-petition
unsecured claim against Level in the amount of Fifty Thousand Dollars ($50,000) pursuant to
this remunerative provision, and, to the extent that Level violates the terms of this Agreed Entry
& Order, that such civil penalty will be a pre-petition unsecured claim for up to an additional
Two Hundred Thousand ($200,000) pursuant to this remunerative provision.

F.      It is hereby ORDERED that Level shall pay Two Hundred and Seventy Five
Thousand Dollars ($275,000.00) to the Attorney General for attorney fees and investigation
costs.  The parties hereto agree that such payment is a pre-petition unsecured claim in the amount
of Two Hundred and Seventy-Five Thousand Dollars ($275,000) pursuant to this remunerative
provision.

G.      The Attorney General shall give Level fourteen (14) calendar days notice before
filing a motion or other pleading seeking contempt of court or other sanctions for violation of
this Agreed Entry & Order .  The notice shall be in writing and set forth those provisions in the
Agreed Entry & Order that the Attorney General believes have been violated.  The fourteen (14)
calendar days notice period shall provide an opportunity for Level to respond to the assertions of
the Attorney General and the parties may use the notice period to attempt a resolution of the
concerns.  Upon receipt of the written notice, Level may request a meeting with the Attorney
General (or a staff person designated by the Attorney General) for the purpose of attempting to
resolve the concerns set forth in the Attorney General's notice.  The Attorney General shall not
unreasonably deny the request for such a meeting.  The giving of such notice shall not prevent
the Attorney General from beginning such proceeding following the expiration of the fourteen

16

(14) calendar day period. The Attorney General reserves his right, if there are exigent circumstances regarding Level's service to its Ohio customers, to by-pass the fourteen (14) calendar day notice period and immediately take any and all legal actions to address those exigent circumstances.

     H.    The Attorney General may notify or serve Level as provided under this Agreed Entry & Order or in any subsequent action at the following address and telephone number:

> H. Jeffrey Schwartz, Esq.
> Benesch, Friedlander, Coplan & Aronoff LLP
> 2300 BP Tower, 200 Public Square
> Cleveland, Ohio 44114-2378
> (216) 363-4500

Level shall notify the Attorney General in writing of any change in the notice/service person or contact information.

     I.    Level, if necessary, may notify the Attorney General under this Agreed Entry & Order at the following address and telephone number:

> Mr. David M. Dembinski
> Assistant Attorney General
> Consumer Protection Section
> 30 East Broad Street, 14th Floor
> Columbus, Ohio 43215
> (614) 644-9618

If Mr. Dembinski is unavailable, Level may notify the Attorney General at the following address and telephone number:

> Senior Deputy Attorney General
> Consumer Protection Section
> 30 East Broad Street, 14th Floor
> Columbus, Ohio 43215
> (614) 644-9618

     J.    Failure of the Attorney General to timely enforce any term, condition, or requirement of this Agreed Entry & Order shall not provide, nor be construed to provide, Level a

defense for noncompliance with any term of this Agreed Entry & Order or any other law, rule, or regulation; nor shall it stop or limit the Attorney General from later enforcing any term of this Agreed Entry & Order or seeking any other remedy available by law, rule, or regulation.

JUDGE W. DUNCAN WHITNEY

APPROVED:

JIM PETRO
Attorney General


DAVID M. DEMBINSKI
Ohio Sup. Ct. Atty. No. 0006978
MICHAEL S. ZIEGLER
Ohio Sup. Ct. Atty. No. 0042206


Assistant Attorneys General
Consumer Protection Section
30 East Broad Street
State Office Tower - 14th Floor
Columbus, Ohio  43215-3428
614/644-9618

Counsel for Plaintiff


JOHN A. GLEASON
Ohio Sup. Ct. Atty. No. 0039150
Benesch, Friedlander, Coplan & Aronoff LLP
88 East Broad Street, Suite 900
Columbus, Ohio  43215-3506
614/223-9300

Counsel for Level Propane Gases, Inc., Debtor
and Debtor-in-Possession

18